JUDGE HERB ROSS (Recalled)

# UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF ALASKA
605 West 4th Avenue, Room 138, Anchorage, AK 99501-2253 — (Website: www.akb.uscourts.gov)
Clerk's Office:  907-271-2655 (1-800-859-8059 In-State) — Judge's Fax:  907-271-2692

**Filed On
12/1/11**

| | |
|---|---|
| In re<br><br>BRAYTON INVESTMENT, LLC,<br><br>Debtor(s) | Case No. A10-00515-HAR<br>In Chapter 7<br><br>**MEMORANDUM DECISION REGARDING McCREADY OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1** |

## Contents                                                                     Page

1- SUMMARY OF DECISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2- FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.1- Suzan's Background and Decision to Develop Cedar Creek . . . . . . . . . . . . . . . . . . . 2
    2.2- Suzan Agrees to Build a Townhouse for the Wikas;  the Wikas Prepay . . . . . . . . . . 3
    2.3- Suzan Runs Into Financial Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.4- The Wikas Become Concerned; Intense Collection Efforts Begin; Suzan's Financial
        Situation Becomes Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.5- The Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2.6- Jim Ward and the Ward Estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.7- Cheryl Becomes the Job Boss; Her Record Keeping Method . . . . . . . . . . . . . . . . . 10
    2.8- Suzan Seeks to Get an Accounting from Cheryl and Reacquire the Property . . . . . . 13
    2.9- The Project is Completed and Two Units and the Duplex Site Are Sold . . . . . . . . 13
    2.10- The Wikas Seek to Foreclose and Brayton Investment Files Chapter 7 . . . . . . . . . 14
    2.11- The Trustee Hires an Accountant, Connie Taylor, to Sort Out the Accounting . . . . 14
    2.12- The Wikas' File Proof of Claim No. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    2.13- The Trustee's Objection to the Wikas' Proof of Claim No. 1 . . . . . . . . . . . . . . . . . 15
    2.14- Suzan's Objection to the Wikas' Proof of Claim No. 1 . . . . . . . . . . . . . . . . . . . . . 16
    2.15- The Wikas' Present Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    2.16- Jim Dokoozian, Suzan's Expert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3- ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    3.1- Standards for a Proof of Claim Objection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    3.2- Standards for Interpretation and Proof of Contract Claim in Alaska . . . . . . . . . . . 20
    3.3- Deficiencies in Wikas' Proof Justifying Construction Cost Overruns . . . . . . . . . . . 24
    3.4- Suzan Cannot Claim an Offset for the Wikas Breach of the Option Agreement . . . 27
    3.5- The Court's Conclusion About Allowable Claim of the Wikas' Proof of Claim . . . . 28

**Contents** Page

4- <u>**CONCLUSION**</u> ........................................................... 33

<u>**Attachment A**</u>, Settlement Agreement dated March 18, 2008

1- <u>**SUMMARY OF DECISION**</u>- Brayton Investment gave the Wikas a deed of trust on real property in Anchorage to secure potential unpaid costs under a settlement agreement between the Wikas and Suzan McCready, owner of Brayton. The Wikas were to finish building three townhouses in Girdwood.

The Wikas assert a $440,000 secured claim (net of attorney fees) for amounts due under the settlement agreement. McCready objected, alleging excessive costs.

Because the Wikas have not given an acceptable accounting of their construction costs or justified costs due to delay in completion, their proof of claim will be decreased to ***$186,394.67.***[1]

2- <u>**FACTUAL AND PROCEDURAL BACKGROUND**</u>- This section of the memorandum contains the court's findings of fact, as well as uncontested historical facts. Additional findings are found in the Analysis section, Section 3.

2.1- <u>**Suzan's Background and Decision to Develop Cedar Creek**</u>- Suzan McCready owned a mortgage brokerage business in Anchorage in 2006 and was purchasing an ERA real estate brokerage. She also had investments in land and commercial properties.

She decided to expand into real estate development. Although she had subdivided raw land before, she undertook her first construction project, the Cedar Creek development in Girdwood, Alaska. Although she had hoped to build more units on the Girdwood property, she eventually received approval for three townhouses and a duplex, five units altogether. The three townhouses were known as "The Arlberg Building."

---

[1] This does not take into account the amount of the Wikas' recoverable attorney fees, which have yet to be determined.

Suzan[2] obtained a construction loan from First National Bank Alaska (FNBA) for about $900,000 for the three townhouses.  She commenced construction in late 2006 or early 2007.  Jim Ward was employed as her construction manager.  The plan was to have the three townhouses completed by the end of summer or early fall in 2007.  Suzan was thinking of keeping one of the townhouses for herself.

**2.2-** <u>**Suzan Agrees to Build a Townhouse for the Wikas;  the Wikas Prepay**</u>-  Suzan and Cheryl-Ann Wika met through their children, some of whom were in the same school.  Their daughters had a common interest in downhill skiing.  The Wikas' three daughters were heavily involved in skiing, and the Wikas wanted to have a permanent home in Girdwood, near the Alyeska ski resort, so the girls could go to school and ski in the same community.

Suzan promoted the sale of one of the proposed Arlberg townhouses to Cheryl.  Cheryl visited the construction project.  She talked to Jim Ward, Suzan's construction manager.  And, she dickered with Suzan for a favorable price.  The townhouses were priced in the $600,000 range.  On April 17, 2007, Suzan agreed to sell the Wikas Unit 3C (the townhouse closest to the street; Unit 3A was the most desirable, being closest to the creek, and Unit 3B was the middle townhouse unit).  The price was a bargain $477,500.  In addition, the Wikas advanced $172,500 to Suzan as a loan, to be repaid in five years.  The total, $650,000, was to be paid over to FNBA to release the lien of the construction loan from Unit 3C.[3]

The Wikas trustingly gave Suzan a $650,000 check without any safeguards that the funds would be used to actually pay FNBA.  The funds were, in fact, never used for that purpose or used in the construction project at all.  Apparently, FNBA was not willing to grant a  partial release at

---

[2] I will use the first names of Suzan McCready and Cheryl-Ann Wika in this memorandum for ease of reference.  No disrespect is intended.

[3] Exhibit 5.  Note: the Wikas' trial exhibits are marked numerically; Suzan's trial exhibits are marked alphabetical.

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                                    Page 3 of 33

1   that stage of construction and/or the regulated townhouse regime was not sufficiently advanced to

2   even allow such a transfer.

3       **2.3- Suzan Runs Into Financial Problems**- In May 2007, the FBI contacted Suzan and told

4   her she was the subject of a criminal investigation involving bank fraud.  Shortly afterwards

5   Suzan  voluntarily refunded $485,000 of the Wikas' $650,000 to them.[4]  Although she was

6   eventually indicted on December 17, 2007, the charges were later dropped.

7       After getting the $485,000 refund, the Wikas were nonetheless anxious to own Unit 3C, so

8   they returned a check for $475,000 to Suzan on about June 19, 2007.  Thus, their advance to

9   Suzan was reduced to $642,500, instead of $650,000.

10      The investigation and the indictment had an adverse effect on Suzan's various business

11  operations.  In the fall of 2007, the Arlberg construction fell behind.  Cheryl noticed that work

12  seemed to have come to a standstill at the end of 2007, and delivery of Unit 3C was months

13  behind schedule.

14      **2.4- The Wikas Become Concerned; Intense Collection Efforts Begin; Suzan's Financial**

15  **Situation Becomes Dire**- The Wikas learned about Suzan's indictment in December 2007.  They

16  were very concerned about the safety of their $642,500 investment.  They heard Suzan was going

17  to hide her assets.  So, without legal advice, they filed three liens against Suzan's real estate

18  holdings in Anchorage, and one against the Cedar Creek development in Girdwood, in January

19  2008 for $650,000.[5]

20      The liens were almost surely illegal under AS 34.35.900, as pointed out by one of Suzan's

21  attorneys.[6]  The Wikas refused at that time to release them, even though they delayed a sale of

22  one parcel.

23  _____

24      [4] Exhibit C.

25      [5] Exhibits D and E.

26      [6] Exhibit H.

27

28  MEMORANDUM DECISION REGARDING McCREADY
    OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                    Page 4 of 33

FNBA was on the verge of calling its construction loan on the Cedar Creek development against Suzan in January 2008 and commencing a foreclosure.

In January 2008, the Wikas hired attorney William Artus to begin a collection suit in the superior court in Anchorage against Suzan. A prejudgment attachment proceeding was held in early March 2008 before Superior Court Judge Sen Tan. Before he ruled, however, the Wikas and Suzan reached a settlement.

**2.5- The Settlement Agreement**- On the courthouse steps in early March 2008, the parties reached a compromise. It was memorialized in the Settlement Agreement entered into on March 18, 2008.[7] The interpretation of this agreement is the centerpiece of this dispute.

It looked like Suzan was going to lose in front of Judge Tan in the prejudgment attachment hearing. Suzan had received $642,500 from the Wikas, which was to be used to pay off the FNBA lien on Unit 3C, but none of it had been used for that purpose. So, her chances did not look good and Suzan was facing the choice of an adverse ruling and/or having to file bankruptcy.

The attorneys and parties negotiated and came up with a plan. The Wikas were to take over the completion of the three townhouses, which were then 70-80% completed. The Wikas would try to assume the FNBA loan which still had funds available to draw of over $300,000. Suzan would provide some funds to release liens on the property, and provide additional security (the deed of trust on the Brayton Investment property) to cover the Wikas' potential expenses.

Even before the agreement was finalized, Suzan quitclaimed the entire Cedar Creek development to the Wikas on March 5, 2008, to facilitate their negotiation with FNBA.[8] Based on the Wikas financial strength and agreement to complete the project, FNBA approved the assumption of the construction loan by the Wikas.

The Settlement Agreement had the following relevant terms (and, omissions):

---

[7] Attachment A to this memorandum, and Exhibit J.

[8] Exhibit 8.

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                              Page 5 of 33

- The debt owed to the Wikas by Suzan is $650,000 (in their post-trial brief, the Wikas concede the proper amount is $642,500).[9]

- Suzan gave the Wikas $130,920 from the sale of other property ("Lot 6"), to be used to satisfy liens on the Cedar Creek property, as an adjunct to assuming the FNBA construction loan.

- On March 5, 2008, Suzan conveyed the "Cedar Creek Property" (consisting of the Arlberg Building and a duplex site which was partially improved with a foundation). This was also as a adjunct to assumption of the FNBA construction loan. This property was encumbered with the $910,000 FNBA deed of trust, plus subcontractor liens and taxes.

- The parties were to cooperate in getting FNBA to approve the assumption.

- Paragraph 6 of the Settlement Agreement provided for the Wikas to hire Jim Ward to manage completion of the project:

> 6. Wikas will hire Jim Ward as their representative to supervise and manage the construction and completion of the Arlberg Building and hire subcontractors to (a) complete the construction of the Arlberg Building, (b) install the paving on the Cedar Creek Property that is required for the Arlberg Building, (c) do the required landscaping on the Cedar Creek Property that is required for the Arlberg Building and (d) do and perform all other work that is needed to complete the construction of the Arlberg Building so that Unit 3A and Unit 3B can be sold to third parties. Jim Ward will be paid a construction management fee of $40,000 for his previous work as construction manager for the Arlberg Building for Suzan and his work as construction manager for completion of the Arlberg Building for Wikas. Jim Ward has given Wikas a list of the estimated costs that will be incurred to complete the construction of the Arlberg Building and the list of costs is attached to this Agreement as Exhibit A. Suzan's signature on this Agreement does not signify her agreement that Jim Ward earned fees or commission in his prior arrangements with Suzan or that the compensation being paid to Jim Ward in this paragraph is justified.

- Exhibit A to the Settlement Agreement is the two page estimate of costs given by Jim Ward to complete the construction (which did not include loan fees and some of the carrying charges). It has a handwritten figure of $516,479 on it, but this appears to be $4,500 high for the total of all the costs (i.e., the court's calculation shows $511,979) and may not take into account three items marked "paid" in the total amount of $13,605.76. So, the amount may be closer to a little less than $500,000. The agreement does not precisely state what the purpose of the Ward estimate is (the Wikas say it is a meaningless attachment which the court should disregard; Suzan said it is an important term of the agreement). This is one of the key disputes in this claims objection proceeding.

---

[9] Wikas' *Final Argument and Post Trial Brief*, at page 5. Docket No. 215.

- There was no agreed date for the Wikas to complete and market the three townhouse units.

- There are several overlapping paragraphs regarding the Wikas' accounting duties, which are key to the court's decision (¶¶ 7 and 9).

Paragraph 7 relates to the accounting for completion of the construction, summed up as "**the Cedar Creek Completion Costs**."

Paragraph 9 relates to any remaining deficiency in making the Wikas whole, which might exist after the Units 3A and 3B are sold; it was to cover any unpaid balance of the Cedar Creek Completion costs. This balance is called "**the Cedar Creek Deficiency**."

7. Wikas will keep complete and accurate records of all costs that they incur and pay to (a) pay the FNBA Loan, (b) satisfy and pay the liens and claims of lien against the Cedar Creek Property and the Arlberg Building, (c) obtain and pay the New FNBA Loan, (d) complete the construction of and sell Unit 3A [*sic*] and Unit 3B in the Arlberg Building, and (e) pay property taxes, insurance, permit fees, utilities and other costs for or pertaining to the Cedar Creek Property and the Arlberg Building, including their attorney fees and costs. All of such fees and costs are collectively referred to in this Agreement as "the Cedar Creek Completion Costs". Suzan will have full and complete access to all information pertaining to the Cedar Creek Completion upon written request to Wikas for such information. At or before the time this Agreement is executed Suzan will give to Wikas originals or copies of all contracts, invoices, bids, checks, plans, drawings, specifications, permits and other things (her entire file) pertaining to the Arlberg Building and construction of the Arlberg Building. Within five (5) days after this Agreement is executed Wikas will give Suzan a list of the documents and things they want Suzan to provide and Suzan will provide the requested documents and things within five (5) days of receiving the list.

* * *

9. When the sales of Unit 3A and Unit 3B have been completed Wikas will provide Suzan with an accounting of the proceeds they receive from the sale of Unit 3A and 3B and of the amounts they have paid and incurred, or that they owe, for the Cedar Creek Completion Costs. The Cedar Creek Completion costs will include compensation for the time and effort that Cheryl Wika has spent and will spend to (a) deal with and negotiate with lien claimants (b) deal with other unpaid costs and claims incurred by Suzan for the Cedar Creek Property and the Arlberg Building, (c) deal with and negotiate with FNBA pertaining to the FNBA Loan and the New FNBA Loan, (d) deal with other matters pertaining to the Cedar Creek Property and the Arlberg Building. The parties agree such reasonable compensation to be paid to Cheryl Wika is three percent (3%) of the sale price of Unit 3A and Unit 3B. Wikas will also give Suzan an accounting of the remaining balance owed, if any, on the FNBA Loan or the New FNBA

Loan, as applicable, when the sales of Unit 3A and Unit 3B have been completed and the other Cedar Creek Completion Costs paid by Wikas. The remaining balance owed on the FNBA Loan or the New FNBA Loan, if, any, and the Cedar Creek Completion Costs paid by Wikas will take into account the $130,920 of Lot 6 Proceeds received by Wikas and disbursed by them according to Paragraphs 3 and 4 of this Agreement. The remaining balance of the FNBA Loan or the New FNBA Loan will be a lien against Unit 3C. Because of her obligation to convey the completed Unit 3C to Wikas free and clear of all liens and claims Suzan will owe Wikas (a) the remaining balance of the FNBA Loan or the New FNBA Loan, plus interest that accrues and continues to accrue on such loan, and (b) the Cedar Creek Completion Costs that were paid directly by the Wikas (after taking into account the receipt and disposition of the $130,920 of Lot 6 Proceeds). The amount Suzan will owe the Wikas after the sales of Unit 3A and Unit 3B have been completed as described in this paragraph, including interest on such amount, is referred to in this Agreement as "the Cedar Creek Deficiency". The Cedar Creek deficiency will accrue interest at the rate of interest on the FNBA Loan or the New FNBA Loan for that portion of the Cedar Creek Deficiency, and at the rate of seven percent (7%) per year from the date the sale of the second townhome in the Arlberg Building is closed and completed on the portion of the Cedar Creek Deficiency that is the Cedar Creek Completion Costs that were paid directly by the Wikas. In addition to the Cedar Creek Deficiency, Suzan will continue to owe Wikas the $172,500 loan, plus interest from January 1, 2008, through the time the sales of Unit 3A and Unit 3B have been completed and until the loan is paid in full.

- In paragraph 15, because any potential "Cedar Creek Deficiency" was unknown, Suzan was to cause the debtor, Brayton Investment, LLC, to give a third deed of trust on its commercial building in Anchorage to secure any unpaid deficiency and any portion of the unpaid $172,500 loan. This was designated "**the Remaining Balance Due**," which is presumably the amount the Wikas have claimed in their Proof of Claim No. 1 in this bankruptcy.

- Paragraphs 19-22 (there are two ¶ 22's, but this relates to the second one) deal with the duplex site. For our purposes, it says if the Wikas sell the duplex, the net proceeds will be applied to "the Remaining Balance Due." The duplex rights were sold to Spinnell Homes for $400,000.

- Finally, the Settlement Agreement contains an option in paragraph 16:

> At any time prior to the sale of Unit 3A or 3B Suzan will have the option to purchase, or arrange for the sale of, the unsold Unit(s) and the Duplex Rights described in Paragraph 19 by paying Wikas the Remaining Balance Due and Suzan will have access to unsold Units 3A or 3B to further this right.

Note that the option is exercisable *prior* to the sale of Units 3A or 3B by paying "the Remaining Balance Due," but paragraphs 9 and 15 describing "the Cedar Creek Deficiency" and "the Remaining Balance Due," respectively contemplate "the

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                              Page 8 of 33

Remaining Balance Due" is a figure derived *after* Units 3A and 3B have been sold. So, the option appears to be flawed.

**2.6-** <u>**Jim Ward and the Ward Estimate**</u>- Jim Ward served as Suzan's construction manager before she turned the property over to the Wikas. She was not completely happy with him, as reflected in ¶ 6 of the Settlement Agreement (last sentence) where she said : "Suzan' s signature on this Agreement does not signify her agreement that Jim Ward earned fees or commission in his prior arrangements with Suzan or that the compensation being paid to Jim Ward in this paragraph is justified."[10]

Cheryl testified that the inclusion of Ward as supervisor or manager of the completion of the Arlberg Building in the Settlement Agreement was required by Suzan, but the court finds he was also probably voluntarily included by the Wikas. Though David Stringer of FNBA, who monitored Suzan's default and the Wikas assumption of the construction loan, did not recall a requirement that the Wikas have a construction manager or a construction budget to complete the project, the court finds that these items were probably a requirement, condition or step in the refinancing of the construction loan. He said the loan was refinanced in part on the strength of the Wikas balance sheet, but since they were not contractors and did not have construction experience, it was probably an interest of FNBA that they had a capable project manager and a financial projection for completing the work.[11]

The $500,000± estimate to complete the construction was not a cap, but it provided a baseline. Suzan's expert, Jim Dokoozian, testified that the estimate was reasonable and four months was a reasonable time to complete the project, from March 2008 (Jim Dokoozian is discussed in Section 2.16 below).

---

[10] Attachment A, *Settlement Agreement*, ¶ 6, at page 4.

[11] *See*, David Stringer email to his staff, dated March 6, 2008, indicating under Other terms and conditions: "b) Budget/contract needs to be provided."

Dokoozian personally knew and had worked with Ward.  He testified that Ward was competent and his estimate was reasonable.  The Ward estimate, on its face, appears to have been developed using mostly price fixed bids.  He specifically noted those items where he was estimating the cost of completion because he did not have bids.[12]

For reasons which were not fully explained in the testimony, Ward gradually stopped attending to the job after the Wikas took over in March 2008.  Perhaps this was due to the fact that the Wikas did not sign a contract Ward had prepared for them, or did not pay the first $20,000 down payment of his fee until April 6, 2008, almost three weeks after the March 18, 2008 Settlement Agreement.[13]

He did provide bids for subcontractors and materialmen, but these appear to have been mostly for time and materials, instead of a fixed cost.  He did not monitor the progress of the job.  The Wikas did not pay him the balance of his $20,000 contract because they felt he had not fulfilled his contract to them.

Throughout her testimony, Cheryl said that the Ward estimate in the Settlement Agreement was inaccurate (too low) and did not include items that the Wikas paid for (for example, some lighting cans for the front of the units).  No line item detail about these costs was given to the court by the Wikas, nor did the show how particular bills they incurred increased particular line items of the Ward estimate.

**2.7-  Cheryl Becomes the Job Boss; Her Record Keeping Method**- So, Cheryl felt she was forced to closely monitor the progress of the construction herself.  She went to the job site every day, making the long trip from Anchorage to Girdwood, sometimes more than once a day.  The only day she took off was Christmas 2008, until the construction was completed.  She is a devoted

---

[12] Attachment A, *Settlement Agreement*, at Exhibit A to the agreement.

[13] Check located in Exhibit 2, which is not Bates stamped.

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                                    Page 10 of 33

1   mother to her three daughters, but had to give up her close, nurturing relationship for more than

2   a year, in order to attend to the construction.  She even cleaned up the construction site every day

3   by herself.

4          But, this was her first construction project (as it was Suzan's).  She did not have the

5   experience to see that work was performed economically, and that it was scheduled and

6   completed in a timely manner.

7          Nor did she keep adequate records to show where the cost overruns were and why they

8   were justified – that is, why they varied so far from the Ward estimate.  She paid the bills as they

9   came in, often with Ward's approval that payment was appropriate.  She made no attempt to

10  organize them using a job cost methodology – that is, showing the costs of a given vendor as they

11  related to a particular aspect of the job.  She made no attempt to coordinate her accounting with

12  the line item categories shown on the Ward estimate.  Not that this is specifically required by the

13  Settlement Agreement, but the Wikas have provided no specific analytical record showing what

14  happened in a way that Suzan (and, the court) could determine whether the costs were reasonable

15  or excessive.

16         Until Connie Taylor was hired by the bankruptcy trustee (*see*, Section 2.11 of this

17  memorandum), there were just a pile of bills that had been put into a spreadsheet or database so

18  they could be sorted by vendor name and date, but without a report or schedule showing how

19  they related to the particular line items in the Ward estimate.

20         The court was afforded a window into the dynamics of the construction project and the

21  way that both Suzan and the Wikas performed during their respective tenures as the contractor.

22

23

24

25

26

27

28  MEMORANDUM DECISION REGARDING McCREADY
    OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                              Page 11 of 33

1  This was in a state court case brought by the Wikas against a decking contractor, All Decked Out

2  (ADO).[14]

3      Cheryl testified in this proceeding that one of the problems she inherited was due to

4  improper siding installed by ADO, which resulted in water damage and required her to retain

5  Carve Construction to redo some of the work at great expense.  The problem is this testimony was

6  not coherently presented so the court could understand what the original Ward estimate entailed

7  for this particular work, why it was too low, what exactly Carve was required to do and why, and

8  what the cost overrun was as a result.  No doubt the information is buried in the stack of invoices

9  provided to the court, but it is not assembled for the court.  In other words, instead of a coherent

10  story, the court was given a stack of bills,[15] and expected to sort it out. Unfortunately, the Wikas'

11  testimony is not presented in a manner that allows the court to reach the conclusion they seek.

12  The overruns could have either been justified or excessive – the Wikas have not shown they were

13  justified.

14      In any event, Superior Court Judge Jack Smith conducted a multi-day bench trial on just

15  the ADO aspect of the Arlberg construction.  Despite Cheryl's claim of defective work by ADO,

16  Judge Smith concluded:

17         16.  On a preponderance of the evidence standard, it is more likely true than
not true that the ADO work although incomplete was not defective.  The

18         Wikas' claim that the ADO work was so defective that they were entitled to
a declaration that the lien should be expunged is DENIED.  Wyrick can seek

19         to foreclose his amended lien pursuant to AS 34.35.110.[16]

20

21      [14] Case No. 3AN-08-07032 CI, <u>Gregory B. Wika and Cheryl-Ann Wika vs. Dane A. Wyrick,</u>

22  <u>individually and d/b/a All Decked Out Co.,</u> in the Superior Court for the State of Alaska, Third Judicial District
at Anchorage.

23      [15] Exhibit 2.

24      [16] Case No. 3AN-07032-CI, <u>Wika v Wyrick</u>, *Findings of Facts and Conclusions of Law*, at page 16,

25  dated June 25, 2009, found in Suzan's objection to the Wikas' relief from stay motion early in the case.  Docket

26

27

28  MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                Page 12 of 33

In our claims objection hearing, there was only cursory testimony about this issue, and nothing to clearly tie the facts together to show the Wikas were justified in the expenditures they incurred and the delays they suffered to the extent any cost overruns should be compensable.

Suzan's expert, Jim Dokoozian, indicated why such cost overruns and delays often occur and generally are not justified in a standard owner-builder situation, where the owner does not have construction contracting experience.  *See*. Section 2.16 of this memorandum.

**2.8- Suzan Seeks to Get an Accounting from Cheryl and Reacquire the Property**-  In an attempt to exercise the option contained in ¶ 16 of the Settlement Agreement, Suzan made overtures to reacquire the property.  Her several attorneys, Erik LeRoy and Michael Brain, requested accountings and proposed exercising the option.  Through July 2009 and October 2009, the parties parried regarding the exercise of the option.[17]  The main frustration on Mr. Brain's part was getting an adequate accounting so that the option could be exercised.  He testified that Mr. Artus gave him a list of bills comprising the amount necessary, but no accounting to show how the bills applied to each aspect of the job.

Finally, Mr. Artus wrote Mr. Brain on November 12, 2009 that Suzan did not have the right to repurchase.[18]

What is striking is the refusal of Cheryl or her counsel to try to resolve the accounting problem at that stage.  They bet the house on the assumption that they did not have to do a more adequate accounting.

**2.9- The Project is Completed and Two Units and the Duplex Site Are Sold**-  Unit 3A was sold for $680,000 on January 29, 2009, under a Conditional Certificate of Occupancy, pending the

---

No. 20, Exhibit C, filed July 7, 2010.  The court takes judicial notice of this document.

[17] *See*, Exhibits K-EE of those exhibits which have been admitted.

[18] Exhibit CC.

completion of landscaping.  A final Certificate of Occupancy was issued on August 4, 2009.   Unit
3B was sold for $600,000 in October 30, 2009.

The duplex land and rights were sold to Spinnell Homes for $400,000 on December 31,
2009.[19]

**2.10-  The Wikas Seek to Foreclose and Brayton Investment Files Chapter 7**- The Wikas
began a nonjudicial foreclosure on their third deed of trust on the Brayton Drive property owned
by the debtor, alleging a debt of about $573,000.  They also seized the rents from the property.

Suzan and Brayton filed a state court action in April 2009 to enjoin the sale, but a
preliminary injunction was denied.  The Wikas were permitted by the state court to proceed with
the foreclosure.  But, before the foreclosure could proceed, this chapter 7 case was filed.

The Wikas moved for relief from stay early in the case, but have agreed to the continuance
of the stay, hoping the trustee could sell the property first.[20]

**2.11-  The Trustee Hires an Accountant, Connie Taylor, to Sort Out the Accounting**-  The
trustee hired a bookkeeper, Connie Taylor, to help him understand the Wikas' proof of claim.[21]
Ms. Taylor did a great service to the parties and court by sorting out the invoices, so they were
categorized by vendor and roughly by trade in several spreadsheets.[22]  She was not asked and did
not attempt to do a construction job cost analysis.  Her report does, however, assist the court and
parties.

---

[19] The closing statements for the three sales are at Exhibit 11.

[20] The facts recited in this section of the memorandum are from the Wikas' motion for relief from stay.
Docket No. 8.

[21] Docket Nos. 39 and 40.

[22] Exhibit 1.

About a week before the trial, during some motion practice in this proceeding, the court asked Mr. Artus, the Wikas' attorney, how they intended to prove their *prima facie* case.  He said he would do this through Cheryl's testimony and the Taylor report (without calling Ms. Taylor, herself).  The court indicated the Taylor report might not be admissible, if challenged, without her presence.  Almost as a afterthought, Mr. Artus said it would probably be best that he call her.  She was not even on the Wikas witness list by name (although Suzan, named her and Cheryl designated witnesses listed by Suzan).[23]

All this is to point out that, at this late date (on the eve of trial), all that Cheryl thought she had to do to prove her case was to present a list of paid invoices, without any proof at all that they were reasonable, how they applied to the specific aspects of the job, and why the job was performed in a timely manner.

**2.12-  The Wikas' File Proof of Claim No. 1**-  Proof of Claim No. 1 is a one page form for $573,293.67, without any explanatory attachments.  It is symptomatic of the Wikas miscalculation in this case, that they could easily meet their burden of proof by filing a listing of their payments, sorted by vendor in chronological order.

**2.13-  The Trustee's Objection to the Wikas' Proof of Claim No. 1**-  The trustee filed an objection to the Wikas' proof of claim.[24]  The trustee raised some of the same arguments that Suzan has subsequently raised, but not all of them.  The court entered an interim order reducing some portions of the Wikas' claim, and allowed an amount of $458,963.03, plus some amount of attorney fees, yet to be determined.[25]

---

[23]  Exhibits 193 and 194.

[24]  Docket No. 74, filed on February 24, 2011.

[25]  Docket No. 92, filed April 11, 2011.

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                                    Page 15 of 33

**2.14- <u>Suzan's Objection to the Wikas' Proof of Claim No. 1</u>**-  The day before the hearing on the trustee's objection, Suzan file her own objection.[26]   She alleged that the Wika's claim was excessive and that their claims in excess of the Ward estimate were unjustified, or at least unexplained.  She argues (and the testimony shows) that:

> According to the surveyor's certificate on the plat (Exhibit F), the structural and mechanical components of the structure were complete. McCready testified, without contradiction, that the exterior of the building was completed except for the rear decks; insulation and sheetrock were in and painting was under way. What remained was interior trim, floor coverings, kitchen cabinets and appliances, finish electrical and plumbing, and landscaping.

Therefore, she says that they were owed very little or nothing on their Proof of Claim No. 1.

**2.15- <u>The Wikas' Present Claim</u>**-  In their post-hearing brief, the Wikas have calculated the amount due them as of October 30, 2011, excluding attorney fees to be $440,601.98 :[27]

[continued on next page]

---

[26] Docket No. 87, filed March 30, 2011.

[27] *See*, the Wikas' *Final Argument and Post Trial Brief.*, page 19 and Exhibit A.  Docket No. 215.

| The Wikas Analysis of Their Allowed Secured Claim (Net of Attorney Fees) | | |
|---|---|---|
| Costs and expenses paid by Wikas | | |
| – Liens paid to release property for takeover | 107,710.55 | |
| – Completion costs for materials, labor, and subs | 720,534.37 | |
| – Utilities | 20,203.49 | |
| – Other Costs and expenses | 189,550.43 | |
| – Amount that should have been paid to Wyrick | 20,000.00 | |
| Total | | 1,037,998.84 |
| Less amounts received by Wikas | | |
| – Lot 6 proceeds | 130,920.00 | |
| – Insurance refund | 3,031.00 | |
| – FNBA construction draw | 255,630.00 | |
| – FNBA construction draw | 50,612.41 | |
| – Release of escrowed funds (Action Drywall) | 77,177.55 | |
| – Release of escrowed funds (Dane Wyrick) | 46,010.60 | |
| – Sale of duplex rights | 359,528.50 | |
| Total | | (922,850.06) |
| Difference (Cedar Creek Deficiency) | | 135,145.78 |
| Other claims | | |
| – Interest on CCD @ 7% - 10/29/09-10/30/11 | 18,920.40 | |
| – Commissions on Unit 3A (6% of $680,000 per ¶¶ 5 & 10 of SA) | 40,800.00 | |
| – Commissions on Unit 3B (6% of $600,000 per ¶¶ 5 & 10 of SA) | 36,000.00 | |
| – Interest on commission @ .3% - 10/29/09-10/30/11 | 460.80 | |
| – $165,000 loan | 165,000.00 | |
| --Interest on loan @ 7% - 1/1/08 - 10/30/11 ($31.64/day x 1,398 days) - approx. | 44,275.00 | |
| Total additional claims | | 304,456.20 |
| Total claimed by Wikas, less attorney fees  (Remaining Balance Due) | | *440,601.98* |

**2.16**- <u>Jim Dokoozian, Suzan's Expert</u>- Suzan originally designated Richard Bull as her proposed expert witness to demystify the facts and conclusions which can be deduced about the Wikas' performance of the construction project that they undertook under the Settlement Agreement. Suzan began extensive discovery of the subcontractors, and the material and labor providers, as well as FNBA and the Wikas, themselves. In the end, Bull was apparently not satisfactory to Suzan, so she designated Jim Dokoozian as her expert, instead.

Dokoozian was not given enough time to analyze the details of the Ward estimate and underlying facts in as much depth as he would have preferred. So his initial report and untimely supplement were sparse in detailed analysis.[28] Nonetheless, Dokoozian had sufficient time, given his experience and expertise, to review the Ward estimate, the building plans, the format of the Wikas' accounting for their claim, to render persuasive testimony in Suzan's behalf. His testimony is summed up as follows:

(a)    the Ward estimate of the projected construction costs to finish the project was appropriate, given the percentage of completion when the Wikas took over;

(b)    four months was an adequate time to have completed the construction;

(c)    the Wikas' method of construction accounting, a chronological list of invoices paid, sorted by vendor, was insufficient to provide a construction job cost accounting analysis showing why the Ward estimate was justifiably exceeded and why the time for completion extended to 21 months, when four months should have been adequate; and,

---

[28] Docket No. 189, filed September 19, 2011, and Docket No. 199, filed October 3, 2011. Suzan's expert report was due on September 19, 2011. Docket No. 154.

1    (d)    the effect of not having a competent construction manager or contractor overseeing

2           the project (a factor in many owner-builder cases where the owner is inexperienced

3           in construction), and how that generally plays out in construction cost overruns

4           and delays which cost money.

5    Dokoozian has over three decades of experience in construction and project management

6    in Alaska. At least twenty years of that have been related to residential construction. He has

7    reviewed numerous sets of building documents, estimated and managed many residential projects

8    for the owner or for the contractor.[29] As such, he has developed an intuition, based on

9    experience, of what is reasonable and what is not.[30]

10   He said a reasonable owner would not accept the construction accounting provided by the

11   Wikas as justification for the construction costs in excess of the Ward estimate without further

12   explanation of how each line item of excessive costs were justified. In a business sense, he said

13   the Wikas had the burden of proof, and the court finds below in Section 3 of this memorandum

14   decision that they also had the legal burden of proof which they have not met.

15   Dokoozian reiterated some of the problems that a person who is not experienced in

16   managing a construction project might encounter:

17   • Scheduling delays abound because the manager does not properly schedule the
       sequential work;

18

19   • Costs are excessive because the manager does not get fixed bids and relies on more
       expensive cost and materials arrangements with the subs and material suppliers;

20

21

22   [29] From the testimony of Jim Dokoozian and his resume. Docket No. 189, Part 3.

23   [30] Regarding the development of intuitive expertise in a field or subject with long, consistent practice
     and training, see: *Thinking Fast and Slow*, by Daniel Kahneman, Chapter 18, *Taming Intuitive Predictions*

24   (Farrar, Straus & Giroux 2011); *The Power of Intuition: How to Use Your Gut Feelings to Make Better
     Decisions at Work*, by Gary Klein (Crown Business 2004); *Outliers: The Story of Success*, by Malcolm Gladwell

25   (Little, Brown & Co. reprint 2011).

26

27

28   MEMORANDUM DECISION REGARDING McCREADY
     OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                                    Page 19 of 33

- Subs and material suppliers generally extend themselves to please a contractor with whom they hope to have a future relationship, and an owner-builder often gets to deal with their B team;

- The job gets a reputation or aura of being a poorly managed project, effecting morale and performance of the subs; and,

- The owner's efforts are often inefficient (e.g., not taking advantage of large purchases to avoid multiple deliveries or having to expedite delivery of small purchases).

### 3- ANALYSIS-

**3.1- Standards for a Proof of Claim Objection-**  A proof of claim filed in accordance with FRBP 3001, "shall constitute *prima facie* evidence of validity and amount of such claim."[31]  An objecting party must come forward with sufficient evidence to rebut the presumption, and show there is a true dispute.  If sufficient evidence is produced, "the burden will fall on whichever party would bear the burden outside bankruptcy."[32]

In this case, Suzan has raised legitimate challenges to the amount of the Wikas' secured claim, so the benefit of a *prima facie* presumption of the validity and amount of their claim is not available to them.

**3.2- Standards for Interpretation and Proof of Contract Claim in Alaska-**  To determine the rights of the parties in this case, where the substantive issue is not controlled by a bankruptcy statute or federal policy, requires the court to look to state law.[33]

This case is principally about the interpretation of the Settlement Agreement.  The Alaska Supreme Court said:

---

[31]  FRBP 3001(f).

[32]  9 *Collier on Bankruptcy*, ¶ 3001.09[2] (Matthew Bender online ed. 2011); In re Placide, ____ BR ____, 2011 WL 5341295, *6  (9th Cir. BAP 2011).

[33]  In re Penrod, 636 F3d 1175, 1178 (9th Cir. 2011), citing Butner v. United States, 440 U.S. 48, 54-57 (1979).

When interpreting a contract, such as the settlement agreement in this case, it is our duty to give effect to the intentions of the parties.  To determine their intentions, we look to the words of the contract and any extrinsic evidence regarding the parties' intentions when they entered into the contract.[34]

In their post-trial brief, the Wikas emphasize that a trial court should not rewrite the contract of the parties, inserting terms they never agreed to; competent parties should be bound by their agreement; a judge should not seek to "improve" a contract, according to the judge's concept of equity, by inserting terms the parties did not agree to; and, ambiguity exists only where terms are reasonably subject to different interpretations.[35]

All this is proffered by the Wikas to persuade the court to completely disregard the Ward estimate of $516,497 as imposing any contractual duties or rights in the Settlement Agreement. They argue:

The Ward estimate is an attachment to the Settlement Agreement.  (Exhibit 7). The cost estimate is described in Paragraph 6 of the  Settlement Agreement as being just what it is: "Jim Ward has given Wikas a list of the estimated cost that will be incurred to complete the construction of the Arlberg Building and the list of costs is attached to this Agreement as Exhibit A". There is nothing ambiguous about the description of the cost estimate. It is simply an estimate of costs provided by Jim Ward. ***The parties did not attach any significance to the estimate in the Settlement Agreement***. It is nothing more than an estimate without any testimony or explanation of how the numbers were calculated or the process that was used to come up with the numbers. The estimate should not be used by the Court as even a guideline or yardstick for measuring the cost to complete the

---

[34] Sourdough Development Services, Inc. v. Riley, 85 P.3d 463, 468 (Alaska 2004) (footnotes omitted).

[35] *Final Argument and Post Trial Brief* by the Wikas, Docket No. 215 at pages 1-3, citing:  Commercial Recycling Center, Ltd. v. Hobbs Industries, Inc., 228 P.3d 93, 98-9 (Alaska 2010); Kazan v. Dough Boys, Inc., 201 P.3d 508[, 514] (Alaska 2009); North Pacific Processors, Inc. v. City and Borough of Yakutat, Alaska, 113 P.3d 575, 586 (Alaska 2005); Ness v. National Indemnity Co. of Nebraska, 247 F.Supp. 944 (D. Alaska 1965); Rego v. Decker, 482 P.2d 834, 937 (Alaska 1971); Casey v Semco Energy, Inc., 92 P.3d 379, 385 (Alaska 2004); Weiner v. Burr, Pease & Kurtz, P.C, 221 P.3d 1, 9 (Alaska 2009); Nelson v Progressive Casualty Ins. Co., 162 P.3d 1228. 1234 (Alaska 2007); O'Neill Investigations, Inc. v. Illinois Employers Ins. of Wausau, 636 P.2d 1170, 1174 (Alaska 1981); Klosterman v Hickel Investment Co., 132 P.3d 262, 269 (Alaska 2006); and, Keffer v. Keffer, 852 P.2d 394, 397 (Alaska 1993).

construction of the townhome building. Erik LeRoy testified that he did not believe that the Wikas' attorney would have allowed them to sign an agreement that had any kind of a cost to complete component or limitation on the costs that they could incur to complete the townhome building. Erik further testified that the Settlement Agreement provided that the Wikas were to be reimbursed for the actual costs they paid and incurred to complete the townhome building. That was the agreement of the parties and that is the agreement that must be enforced by the Court. [emphasis added][36]

Suzan did attach great significance to the estimate. It was assurance that the Wikas did not have an open ticket to incur unnecessary expenses. And, I do not believe Cheryl's testimony when she says that the clause was not intended to have any significance. It appears to be an integral part of the parties settlement and cannot and should not simply be ignored. Ignoring it would be contrary to the rule of interpretation in Alaska:

> The goal of contract interpretation is to give effect to the parties' reasonable expectations, which we assess by examining the language of the disputed provisions, the language of other provisions, relevant extrinsic evidence, and case law interpreting similar provisions. *In reaching a reasonable interpretation of a contract, we attempt to give effect to all of its terms, if possible. We consider disputed language within the context of the whole contract and its purposes, and the circumstances surrounding its formation.* [emphasis added; footnotes omitted][37]

And, while the court should not arbitrarily make up terms for the parties, the court can supply terms which fill in gaps where the contract is not complete. The Alaska Supreme Court has explained this concept as follows:

> If the superior court finds that the provision was not intended to apply in this situation, it may supply a provision that is reasonable under the circumstances. Under section 204 of the Restatement (Second) of Contracts, "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is

---

[36] *Final Argument and Post Trial Brief* by the Wikas, Docket No. 215 at page 6.

[37] Matanuska Electric Assoc. v. Chugach Electric Assoc., 99 P.3d 553, 562 (Alaska 2004). Wolff v. Cunningham, 187 P.3d 479, 482 (Alaska 2008).

supplied by the court."   Comment d to Section 204 instructs on how the court should supply an omitted term:

> The process of supplying an omitted term has sometimes been disguised as a literal or purposive reading of contract language directed to a situation other than the situation that arises. Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the circumstances. *But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.* [emphasis in original; footnotes omitted][38]

The Settlement Agreement does not give a specific deadline for completion of the construction.  It is implicit that the time was not open ended, however.  The longer it took, the more it costs for FNBA interest, heating costs, taxes, and utilities, for example.  Where no time for performance is specified in a contract for performance, a reasonable time is implied.  What is reasonable is a question of fact.[39]  I find that the Dokoozian estimate of four or five months to complete the construction is appropriate as an implied "reasonable time."

In Section 3.5 of this memorandum decision, I will reiterate my findings and conclusions about how the Ward estimate effects this specific contract dispute.  In general, the reasonable inference I draw from the testimony and exhibits is that the Ward estimate should be treated as a baseline of what was reasonable to complete the project of finishing the three townhouses to the point that two of them could be sold and the third legally occupied by the Wikas.[40]  To the extent

---

[38] Disotell v. Stiltner, 100 P.3d 890, 896 (Alaska 2004).

[39] Hall v. Add-Ventures, Ltd., 655 P.2d 1081, 1089 (Alaska 1985); Commercial Recycling Center, Ltd. v. Hobbs Industries, Inc., 228 P.3d 93, 102 (Alaska 2010).

[40] Cummins v King & Sons, 453 P.2d 465, 467 (Alaska 1969) ("An inference is a fact or proposition deduced, by a process of reasoning, as a logical consequence from other established facts."); Roach v. Benson, 503 P.2d 1392, 1394 (Alaska 1972).

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                    Page 23 of 33

there was a substantial variance from the estimate, it was the Wikas' burden to explain why the overrun was justified or that it was not the Wikas' fault.[41]

The overrun could have been justified (for example, inclement weather, material shortage, etc.).  Or, the overrun might not have been justified (improper or incompetent project management, unnecessary interference with the job progress, spending more on the owners' unit than contract allowed, etc.).  In one circumstance the Wikas should recover; in the other, they have assumed the risk and should bear the excess costs.

**3.3-  Deficiencies in Wikas' Proof Justifying Construction Cost Overruns**-  "In the construction industry it is an accepted truism that delay costs money."[42]  Delays result in decreased efficiency.[43]  Delays caused by the contractor may be due to management problems, the management of subconstractors, inadequate resources, etc.[44]  As one commentator explains:

> Projects completed *within budget* are seldom finished *behind schedule*.
>
> This principle of the money value of time confirms that if the project is completed within schedule, then a significant opportunity to maintain or improve budgeted cost expenditures exists, particularly when influenced by a conscientious project management control system. This concept is important because most project managers concentrate on cost expenditures as the primary indicator of successful project execution rather than the schedule.
>
> Generally, managers use the schedule to depict progress toward schedule completion for the benefit of the client as a result of contractual obligations rather than as the primary means to control the methodical execution of the project plan. The schedule is not used as the basic control mechanism of the project which, when implemented within a properly managed project controls environment, results in the identification of discrete tasks that may

---

[41] Geolar, Inc. v. Gilbert/Commonwealth, Inc. of Michigan, 874 P.2d 937, 943-45 (Alaska 1994).

[42] Acret, *Construction Litigation Handbook 2d*, § 7:1.

[43] Bramble, *Construction Delay Claims*, § 4.04 *Lost Productivity and Efficiency* (Aspen Publishers 2011).

[44] *Id.*, § 3.04 *Contractor Caused Delay*.

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                          Page 24 of 33

result in deviations to the approved project target schedule and, hence, the corresponding control budget.

One long-standing issue regarding effective project management is whether budget or schedule is more important. Rather than placing the two at odds, they should both be considered vital and interrelated components of a properly administered execution plan. Profit (the budget) is the reason for the project's existence and the schedule is the means to generally achieve the profit. However, more emphasis (than is currently given) should be directed toward achieving the project schedule, as this effort will almost assuredly translate to a profitable project.[45]

In this case, a job that should have been finished in four months, took 21 months. This delay more probably than not caused excess costs through inefficiency and excessively high bids. The Ward estimate provided a baseline of what the construction costs should have been. It was incumbent on the Wikas to explain the variance. They have steadfastly refused to provide a coherent job cost accounting – that is, an accounting explaining the costs of each segment of the construction they undertook. The court suggested they follow the outline of the Ward estimate and break down the costs that way. The Wikas adamantly refused, and the testimony indicated they refused to give such an accounting to Suzan when she sought to exercise the option to purchase.

Although this was not a huge project, production of some type of job cost accounting was incumbent on the Wikas to apprise Suzan that she was getting what she bargained for, completion of the job within a reasonable budget and time frame. In describing the function of cost accounting, one commentator notes:

[1] Accounting for Contract Costs

*Construction costs are accounted for by project and, within a project, these costs are further broken down by item of work*. For example, concrete work can be accounted for by structure or area within a project; then by operation such as forming, placement, finishing, and stripping; and finally by cost category within each operation such as labor, materials, equipment, and

---

[45] 2-23 *Financial Mgt & Acctng - Construction Industry* § 23.01 (Matthew Bender & Co, Inc. 2011).

other costs. Along with associated costs, contractors frequently account for production data. Accounting for both cost and production data permits the calculation of unit cost information, which is an extremely useful tool. *In some cases, the cost accounting detail is consistent with the manner in which the original estimate was prepared. In other cases, it is rearranged to more closely reflect how the project is being built, or how the project is being billed to the owner.*[46] [emphasis added]

Whatever accounting was required, the Wikas did not provide an adequate one. The Wikas have not itemized or organized their costs for subcontractors, material and labor in a way that can be rationally analyzed. They have presented a list of invoices (probably about three inches deep; 750-1000 pages without Bates stamping), albeit sorted by vendor and date, but not tied it into the project.[47] Thus, there is no way to analyze whether the costs were excessive or not. Assuming most of them were paid, it is still likely that the overruns were incurred through inefficiency or inexperience.

The contract called for experienced project management. For reasons not fully explained in the testimony, Cheryl took over managing the job from Jim Ward. Although she continued to rely on him for procuring bids, she eventually did not pay about half or $20,000 of his agreed contract.

It was incumbent on the Wikas to show the cost overruns were justified. Even if the court is wrong about the burden of proof, they had the burden to go forward with enough evidence to explain the overruns. This they did not do.

There is an analogy to the way the court requires attorneys to support their attorney fee applications in bankruptcy. A long list of time entries will not suffice. In the application, " . . .

---

[46] 1-1 *Financial Mgt & Acctng - Construction Industry* § 1.09 (Matthew Bender & Co, Inc. 2011).

[47] Exhibit 2.

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                    Page 26 of 33

fees and expenses must: [A] be catagorized to group identifiable projects separately; . . ."[48]

Something similar was required of the Wikas in this case with respect to the construction costs.

### 3.4-  Suzan Cannot Claim an Offset for the Wikas Breach of the Option Agreement-

Suzan presented testimony that the Wikas stonewalled or impeded her effort to exercise her

option to purchase per ¶ 16 of the Settlement Agreement:

> At any time prior to the sale of Unit 3A or 3B Suzan will have the option to purchase, or arrange sale of, the unsold Unit(s) and Duplex Rights described in Paragraph 19 by paying Wikas the Remaining Balance Due and Suzan will have access to unsold Unit 3A or 3B to further this right.

Suzan took steps to invoke the option clause both before Units 3A and 3B had been sold,

and also after Unit 3A was sold, but Unit 3B was still available.[49]  However, because of an internal

inconsistency in the option, it was unworkable on its face.  Paragraph 15 of the Settlement

Agreement defines what "the Remaining Balance Due" means.  The definition says the Remaining

Balance Due will include "the Cedar Creek Deficiency" (as defined in paragraph 9 of the

agreement).  Both paragraph 9 and paragraph 15 contemplate "the Cedar Creek Deficiency" is to

be determine *after* Units 3A and 3B are sold.  Since Suzan tried to exercise the option *before* they

were both sold (even though the wording of the option contemplated that), it was impossible to

know what the option price should be.

Thus, the prior sale of both units was a condition precedent to being able to exercise the

option, and since that condition had not occurred, there was no enforceable option.[50]

---

[48]  Alaska LBR 2016-1(c)(5)[A].

[49]  *Suzan McCready's Post-Hearing Memorandum*, Docket No. 216, page 8-11.  There was extensive testimony on the option issue from Suzan, Michael Brain, Erik LeRoy and Jean Hebert, but for the purposes of denying the offset, the court need only rely on Suzan's contentions, as set forth in her brief.

[50]  Jarvis v. Ensminger, 134 P.3d 353, 358-59 (Alaska 2006); Harris v. Ahtna, Inc., 107 P.3d 271, 277-78 (Alaska 2005).

1    And, even if there was an enforceable option, the court finds that Suzan's calculations of

2    damages to use as an offset to the Wikas' claim are not persuasive.[51]

3    **3.5- The Court's Conclusion About Allowable Claim of the Wikas' Proof of Claim**- In the

4    beginning, before the Wikas began collection efforts against Suzan, Suzan owed the Wikas duties

5    to perform under the original construction contract (or, one of its iterations).  And, she defaulted

6    in her performance.

7    Then the parties reached a settlement, and the position of the parties reversed almost 180°.

8    The Wikas owed a duty to perform the completion of the construction of the three townhouse

9    units.  As indicated in Section 3.2 of the memorandum decision, this included an implied term to

10   complete the job within a reasonable time and for a reasonable amount.  The Ward estimate of

11   **$516,479** is not a cost ceiling under the Settlement Agreement, but a baseline of expected costs.  It

12   has the effect of requiring the Wikas to show how any significant overrun was justified under the

13   circumstances.

14   That is, the burden of proof is on the Wikas to show why the amounts they claim in their

15   post-hearing brief for the hard construction costs is justified – the amount is **$720,534.37** for

16   "Completion Costs for Materials, Labor and Subcontractors" and **$20,203.49** for "Utilities, etc.", or

17   a total of **$740,737.86**.[52]   This is more than 43% , or almost $225,000, over the base amount

18   calculated by Jim Ward.

19   Suzan comes up with even a bigger overrun - **$344,264**, or 68%.[53]  It is not necessary for

20   the court to decide if Suzan's calculations are accurate.  It is enough to find that the Wikas have

21

22

23   [51] They are summarized in *Suzan McCready's Post-Hearing Memorandum*, Docket No. 216, page 8-11.

24   [52] *See*, Exhibit 1 to the Wikas' *Final Argumet and Post Trial Brief.*  Docket No. 215.

25   [53] *Suzan McCready's Post-Hearing Memorandum*, Docket No. 216, page 6, fn 6, and Exhibit 5.

26

27

28   MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                                    Page 28 of 33

not sufficiently explained why their claim in an amount so far exceeding the Ward estimate –
even using their numbers – is justified.

In addition, if four months is a reasonable time for completion of construction, and the
project took much longer, additional carrying charges for the FNBA loans, taxes, and utility costs
were incurred.  If they were incurred due to delays attributable to the Wikas' performance of
their contractual obligations, they should not be recoverable.

So the question is:

> do the Wikas *only* have to show they paid invoices for the $740,000
> and incurred the additional carrying charges to prove their right to
> an allowed secured claim for $440,000 (plus attorney fees, yet to be
> addressed), and thus require Suzan to affirmatively show that the
> amount is excessive?
>
> or
>
> do the Wikas have to *both* show the $740,000 and carrying costs
> were borne by them *and* also justify the excess costs over the Ward
> estimate and the delay over the reasonable time to complete the
> project?

The court has concluded the latter standard is the proper one.  While there may well be
justifications for the cost overruns and time delays, the Wikas did not to produce sufficient
evidence for the court to make that finding.

The court will, nonetheless, allow a nominal 10% margin of error on the $516,479 ( giving
them the benefit of any footing errors in arriving at that amount and, also, not deducting the
amounts the Ward estimate indicated had already been paid) and bump the allowed construction
cost figure up to **$570,000.**

Lacking adequate proof to the contrary from the Wikas, the court will assume four or five
months was adequate to finish construction – that is by August 2008 – and find that both Units 3A
and 3B, as well as the duplex foundation, should have been sold by January 2009.

I will reduce some of the carrying charges appropriately, and recalculate the allowed Wika secured claim as follows, using the same format used by the Wikas[54] and the court in Section 2.15 of this memorandum, above.  I have added notes to explain the reductions:

[continued on next page]

---

[54] *See*, the Wikas' *Final Argument and Post Trial Brief.*, page 19 and Exhibit A.  Docket No. 215.

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                    Page 30 of 33

| Allowed Amount of Wikas' Secured Claim (Net of Attorney Fees) | | |
|---|---|---|
| Costs and expenses paid by Wikas | | |
| – Liens paid to release property for takeover | 107,710.55 | |
| – Completion costs for materials, labor, and subs [**Note 1**] | 570,000,00 | |
| – Utilities [**Note 2**] | 10,101.75 | |
| – Other Costs and expenses [**Note 3**] | 134,933.63 | |
| – Amount that should have been paid to Wyrick [**Note 4**] | 0.00 | |
| Total | | 822,7445.93 |
| | | |
| Less amounts received by Wikas | | |
| – Lot 6 proceeds | 130,920.00 | |
| – Insurance refund` | 3,031.00 | |
| – FNBA construction draw | 255,630.00 | |
| – FNBA construction draw | 50,612.41 | |
| – Release of escrowed funds (Action Drywall) | 77,177.55 | |
| – Release of escrowed funds (Dane Wyrick) | 46,010.60 | |
| – Sale of duplex rights | 359,528.50 | |
| Total | | (922,850.06) |
| Difference (Cedar Creek Deficiency) | | (100,104.13) |
| Other claims | | |
| – Interest on CCD @ 7% - 10/29/09-10/30/11   [**Note 5**] | 0.00 | |
| – Commissions on Unit 3A (6% of $680,000 per ¶¶ 5 & 10 of SA) | 40,800.00 | |
| – Commissions on Unit 3B (6% of $600,000 per ¶¶ 5 & 10 of SA) | 36,000.00 | |
| – Interest on commission @ .3% - 10/29/09-10/30/11 | 460.80 | |
| – $165,000 loan | 165,00.00 | |
| --Interest on loan @ 7% - 1/1/08 - 10/30/11 ($31.64/day x 1,398 days) | 44,238.08 | |
| Total additional claims | | 264,498.80 |
| Total claimed by Wikas, less attorney fees  (Remaining Balance Due) | | *186,394.67* |

## Notes to Court's Calculations

Note 1-      This reduction from $720,534.37 to $570,000 is explained on the page 29, just before the preceding table.

Note 2-      The reduction in utility fees to $10,101.75 is an estimate, using one-half of the claimed $20,203.49. The estimate is based on the finding the project should be completed in 2008, and sold out by January 2009.

Note 3-      The amount claimed of $189,550.43 was reduced to $134,197.22 for a reduction of the FNBA interest (from $81,541.89 to $52,293.87), the Municipality of Anchorage taxes (from $28,886.76 to $13,922.66), and the fuel allowance (from $15,652.02 by reducing it by two-thirds, or $10,434.68).

The $189,550.43 claimed by the Wikas came from the schedule of "Other Costs and Expense" in the Wikas' post-trial brief.[55]

The FNBA interest deduction was arrived at by deleting interest after January 2009, by which time the court finds Units 3A and 3B, and the duplex rights should have been sold. The court used Connie Taylor's calculations to make this reduction.[56]

The MOA deduction to $13,932.66 was derived by prorating the Connie Taylor calculation to include amounts only through January 2009.[57]

The reduction in the fuel allowance is based on the finding that the project should have been managed by Jim Ward, not Cheryl, and allowance of the amount appears excessive. Jim Ward's fee of $40,000 was already calculated in his estimate of $516,479.

Note 4-      The $20,000 claim for amounts due Wyrick was deleted since the Wikas apparently did not pay it.

Note 5-      The interest on the Cedar Creek Deficiency is deleted as there was no deficiency.

* * *

The parties have squabbled about whether or not the Wikas got the benefit of a $12,294 check Suzan gave to Cheryl before the Wikas took over the project. Because the court cannot

---

[55] Wikas' *Final Argument and Post Trial Brief*, at page 19 and Exhibit 1 (page 2, Schedule D). Docket No. 215.

[56] Connie Taylor's detail on the FNBA interest is found in Exhibit 1, page 45 of 47. The court simply subtracted the interest after January 2009 to arrive at $52,293.87.

[57] Connie Taylor's detail on the MOA taxes is found in Exhibit 1, page 12 of 47. Ms. Taylor's figures varied slightly (about $30) from those shown by the Wikas in their closing brief.

MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                                    Page 32 of 33

1    determine what the effect of this is on my calculations, or where it fits in to the big picture, I will

2    disregard the issue.

3        4- **CONCLUSION**-   The amount of the Wikas' allowed secured claim to date,

4    $186,394.67, is still net of attorney fees.  The court will enter an order implementing this

5    memorandum decision, but it will not be a final order that needs to be appealed until the court

6    determines what the Wikas' allowable attorney fees are.

7        The court will order a status conference to address the attorney fee issue.

8

9        DATED:  December 1, 2011

10

11                                    _____/s/ Herb Ross_____
                                    HERB ROSS

12                               U.S. Bankruptcy Judge

13    <u>Serve</u>:
    David Bundy, Esq., for Suzan McCready

14    William Artus, Esq., for Gregory and Cheryl-Ann Wika
    Gary Spraker, Esq., for the trustee

15    Robert Hume, Esq., for Jean Hebert
    Kenneth Battley, Trustee

16    United States Trustee- Anchorage

17        12/1/2011                                                            D7528

18

19

20

21

22

23

24

25

26

27

28    MEMORANDUM DECISION REGARDING McCREADY
OBJECTION TO THE WIKAS' PROOF OF CLAIM NO. 1                   Page 33 of 33